**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

NICOLE REX,

                Plaintiff,

v.                             CIVIL ACTION NO.  5:15-cv-01017

WEST VIRGINIA SCHOOL OF
OSTEOPATHIC MEDICINE,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Defendant's Motion for Summary Judgment* (Document 100), the *Memorandum of Law in Support of Defendant West Virginia School of Osteopathic Medicine's Motion for Summary Judgment* (Document 101), the *Motion for Entry of Summary Judgment on Behalf of Defendant West Virginia School of Osteopathic Medicine* (Document 112), the *Plaintiff's Response to Defendant's Motion for Entry of Summary Judgment on Behalf of Defendant West Virginia School of Osteopathic Medicine* (Document 114), and the *Defendant's Reply to Plaintiff's Response to Defendant's Motion for Entry of Summary Judgment* (Document 118).   For the reasons stated herein, the Court finds that the motion for entry of summary judgment should be denied and the motion for summary judgment should be granted.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff Nicole Rex initiated this action with a *Complaint* (Document 1) filed on January 23, 2015.   Her first amended complaint was filed on February 23, 2015.   In the amended

complaint, she named the following defendants: West Virginia School of Osteopathic Medicine (WVSOM); Michael Adelman, in his official and individual capacity; Leslie Bicksler, in her official and individual capacity; Elaine Soper, in her official and individual capacity; Jeffrey Shawver, in his official and individual capacity; and Tiffany Wright. On June 8, 2015, she filed a *Stipulation of Voluntary Dismissal of Defendants Jeffrey Shawver and Tiffany Wright* (Document 27). The Defendants filed a motion to dismiss, which the Court granted in part and denied in part in a *Memorandum Opinion and Order* (Document 30) filed on August 11, 2015. The Plaintiff subsequently voluntarily dismissed claims against the individual defendants, leaving WVSOM as the sole defendant. The causes of action that remain pending are Title IX claims, invasion of privacy, unauthorized practice of law, and intentional infliction of emotional distress.

Ms. Rex was a first year medical student at WVSOM in 2012. She alleges, in short, that a fellow student, D.M., drugged and raped her after she had been drinking at an off-campus party they both attended on August 31, 2012. She reported the alleged rape to WVSOM, and asserts in her complaint that the school mishandled the investigation and created such a hostile environment that she was forced to withdraw and transfer to another medical school. WVSOM moved for summary judgment on January 25, 2017, the deadline for filing such motions. (*See* Document 95, granting joint motion to extend the dispositive motions deadline to January 25, 2017.) The Plaintiff filed no response within the fourteen-day response period. On February 28, 2017, the Defendant filed its motion for entry of summary judgment, based on the Plaintiff's failure to respond. On March 7, 2017, the Plaintiff responded to the motion for entry of summary judgment, asserting that ongoing discovery issues preclude a response to the motion for summary judgment.

Because the Plaintiff has not responded to the motion for summary judgment,[1] the facts that follow are based exclusively on the Defendant's motion and attached exhibits. The facts are, however, described in the light most favorable to the Plaintiff as the non-moving party.

Ms. Rex attended an off-campus "Around the World" party,[2] hosted and attended by fellow WVSOM students, in the evening of August 31, 2012, and extending into the morning of September 1, 2012. She met D.M. at the first apartment, when he arrived with a bottle of Jägermeister and offered shots to those present. Ms. Rex accepted, and D.M. continued to provide her with shots as the party moved to the second apartment. D.M. claimed, in his written response to Ms. Rex's complaint, that he "asked Nicole if she really wanted to keep doing shots, telling her that this was a lot to start off with," and she responded that she was used to partying hard. (D.M. Response) (Document 100-3.) Two student witnesses observed Ms. Rex and D.M. flirting, dancing, and kissing during the party, though Ms. Rex does not recall kissing or making out with D.M. Another saw Ms. Rex hanging out, flirting, and taking shots with D.M. Ms. Rex and D.M. separated for a time, and Ms. Rex does not remember any events after the third apartment, at which she arrived around 11:00 p.m. None of the student witnesses interviewed by WVSOM recalled speaking with Ms. Rex or directly interacting with her during the time period she is unable to recall. Ms. Rex and D.M. apparently met up again at the last apartment where the party was held, around 1:30 a.m. D.M. brought Ms. Rex with him to a friend's nearby apartment.

When Ms. Rex awoke around 4:30 a.m., D.M. was on top of her, penetrating her. She did not know where she was or who he was at that point, and was still intoxicated and confused. Ms.

---

1 The Court will more fully discuss the Defendant's motion for entry of summary judgment and the Plaintiff's response thereto *supra*.

2 The party was held at several separate apartments, each decorated to represent a country.

Rex accompanied D.M. to Hardee's for breakfast, and then returned to D.M.'s apartment. D.M.'s roommate let them in shortly after 5:00 a.m., and told the WVSOM investigators that Ms. Rex appeared to be there voluntarily, and D.M. did not appear to be intoxicated at that point. The roommate also reported observing D.M. and Ms. Rex cuddled together at 10:00 a.m., when he entered D.M.'s bedroom to borrow his car keys, and around noon, when he returned the keys. Ms. Rex disputes that they were "cuddled" together, but also reported that she slept for some hours during the morning. D.M. admitted to smoking marijuana both during the party, where he shared it with other students, and at his apartment.

Another sexual encounter took place at D.M.'s apartment. Ms. Rex was afraid active resistance would trigger greater aggression from D.M., and instead curled up in the corner of the bed, engaged in conversation, told him it hurt, and tried to show how uncomfortable she was through passive resistance. Her conversation included asking what had happened the night before, how it had escalated, and telling him she would not have realized they had had sex if not for how sore she was. He pulled her into position, removed her pants, told her to fellate him, pinned her wrists down, and began penetrating her, then returned to demanding oral sex. In her deposition, Ms. Rex indicates that, though she did not explicitly say no, she "would ask like do I have to do this and he would proceed." (N. Rex Depo. at 59::11–12) (Document 100-4.) When she complained of soreness, D.M. said it was "not uncommon for [him] to make girls sore" and stated that the vagina is "made to take a beating." (D.M. Resp.) D.M. then drove Ms. Rex back to the apartment where she had left her car and keys. She reported that her arm and wrist were sore, and she experienced vaginal bleeding for several days thereafter.

Ms. Rex told a study partner and a friend/mentor who was a second-year student what had happened to her on September 5, 2012.   Her friend suggested she report it to Dean John Schriefer, the Associate Dean of Preclinical Students, and set up an appointment for her to meet with him.[3] Prior to the meeting, Dr. Schriefer informed WVSOM President Michael Adelman and Dean Pence, Vice President for Academic Affairs of the matter.   On September 6, 2012, Dr. Schriefer, his assistant Deborah Harvey, Ms. Rex, and the two fellow students met.   Ms. Rex described the incident, which is recounted in WVSOM's summary of the investigation.   It is noted that Ms. Rex "stated that she had been drinking, but did not think she had had enough to suffer a blackout," and stated that her "memory was hazy" for some time after she woke up to D.M. having sexual intercourse with her.   (WVSOM Inv. Notes at 1) (Document 100-7.)

The group proceeded to the Lewisburg Police Department to report the sexual assault.   A detective interviewed Ms. Rex privately for about an hour, after which she and her friends went to the Greenbrier Valley Medical Center for an examination.   Dr. Schriefer reported back to President Adelman and Dean Pence.   President Adelman met with Dean Pence, Marilea Butcher, the Associate Vice President for Administrative Affairs, Denise Getson, Director of Marketing & Public Relations, Dr. Elaine Soper, Title IX Officer, and Leslie Bicksler, Associate Vice President for Human Resources.   Dr. Soper and Ms. Bicksler agreed to launch an investigation.   They met with Dr. Schriefer on September 7, 2012, to receive an update.

As WVSOM began its investigation, Ms. Rex, at the recommendation of the detective to whom she reported the incident, pursued a Personal Safety Order in the Greenbrier County

---

3  The Student Handbook states that complaints of sexual harassment or discrimination are to be made to the Dean of Student Affairs or the Director of Human Resources.   Ms. Rex was unaware of anyone with those titles, and the Court notes Ms. Bicksler's title, according to WVSOM's summary of the early stages of the investigation, is Associate Vice President of Human Resources.

Magistrate Court. WVSOM was informed on September 10, 2012, that D.M. had been served with a preliminary Personal Safety Order. On September 12, 2012, Ms. Rex signed a formal sexual harassment complaint for WVSOM. On September 14, 2012, D.M. met with Dr. Schriefer to give a statement with his side of the story. He said that he and Ms. Rex both had about seven shots of Jagermeister at the second apartment, then met up again at the fourth apartment, where he invited her to leave with him. They made out, had sex, slept, went to Hardee's for breakfast, returned to his apartment, had sex again, and he dropped her off at her car. D.M. asserted that he believed all sexual contact was consensual. On September 18, 2012, WVSOM gave both Ms. Rex and D.M. a No-Contact Order barring them from contacting one another in any way, including via a third party.

While the investigation was ongoing, WVSOM offered Ms. Rex an escort on campus. WVSOM indicates that she rejected the escort, and Ms. Rex indicates that he was not always available. Dr. Schriefer or his assistant often escorted her to classes or monitored the hallways before and after classes. She was given a parking spot next to Dr. Schriefer's office. WVSOM offered her a medical leave of absence, which she declined at that time. She did receive extensions for meetings, excused absences for classes, and extensions for tests and assignments. She was also provided with a packet of information, including forms to complete to initiate the complaint process, on September 19. That information included counseling resources, and Ms. Bicksler and Ms. Soper made a first appointment for Ms. Rex to meet with a counselor.

The Magistrate Court of Greenbrier County held a personal safety hearing on September 19. Ms. Rex had heard that D.M. planned to have an attorney present, and asked President

Adelman, who she believed to be an attorney,[4] whether she needed counsel at the hearing. President Adelman told her that she did not need a lawyer, and said that Dr. Schriefer could be at the hearing with her. Around the time of the hearing, Ms. Bicksler and Dr. Soper told Dr. Schriefer he needed to remain neutral. Dr. Schriefer therefore avoided Ms. Rex at the hearing, and she ultimately sought a continuance so that she could appear with counsel. The hearing was continued to September 25, and the magistrate granted a two-year personal safety order, which was later reversed on appeal in the Circuit Court of Greenbrier County.

Ms. Rex submitted her formal complaint on October 2, 2012, and D.M. submitted his response on November 19, 2012. On December 3, 2012, Ms. Rex submitted a response, disputing some of the details in D.M.'s account. She specifically states that her first recollection after leaving the apartment representing France was "waking up to him being on top of me and penetrating me." (N. Rex Inv. Reply) (Document 100-17 at 54.) She describes the second encounter, and her attempts to resist it, as follows:

> I told him I didn't remember anything of the night before and I wouldn't have thought anything happened except that I did hurt. I also started asking a plethora of questions as to what happened, where did we go, how did things escalate, etc. I never initiated sex, oral sex, or anything of that nature. There was not foreplay, cuddling, kissing, and multiple positions. There was only him unbuttoning my pants and pinning me down by my wrists, telling me to orally please him and/or pulling me to the edge of the bed to do so. Since he didn't seem to care about what I considered obvious discomfort, I hesitantly would do as I was told.

(*Id.*)

Ms. Rex complains that WVSOM did not keep her informed about the process during the course of the investigation, often telling her it would be concluded soon, then not updating her for

---

4 Ms. Rex indicated in her deposition that she did not recall who had told her Dr. Adelman was a licensed attorney.

weeks.   WVSOM gave D.M. extensions to file his response, with the result that Ms. Rex thought the investigation was near completion when his response had not even been submitted.   In addition, WVSOM began an investigation of Ms. Rex's aunt, a WVSOM employee with whom she lived, during her pursuit of the sexual harassment/discrimination complaint.   Between that investigation, the no-contact order, the inconsistent advice from Dr. Schriefer about whether to support her, and advice from WVSOM that she keep the case confidential and not discuss it with other students, Ms. Rex said that she felt isolated.   She felt that her support system was being pulled away from her.   A WVSOM employee who was a friend (and a sexual partner) of D.M. had conversations with WVSOM students about Ms. Rex in relation to her complaint, though the extent of those conversations is unclear.   Students would ask her if she was "the first year that's been raped."   (N. Rex Depo., at 144::16–17.)   Handwritten WVSOM notes from a September 19, 2012 meeting indicate that the matter was being discussed on campus, and it "feels like he's bragging" causing her to "feel[] stuck on that weekend" and subject to "millions of questions." (9/19/12 WVSOM Notes) (Document 100-13.)[5]   One of D.M.'s friends posted a message on Facebook reading: "I woke up in a nice hotel in my underwear with no memory of how I got there. Here's to an amazing birthday that I'll remember only parts of! Thanks boys!"   (C.W. Facebook post) (Document 100-38.)   D.M. was "tagged" in the post.

WVSOM's investigation included several student interviews.   Three student witnesses recounted separated experiences unrelated to Ms. Rex's complaint in which D.M. solicited them for sex in a manner that made them uncomfortable.   Each was able to decline further interactions without D.M. becoming aggressive, however.   Other witnesses, as described above, recounted

---

5 Those notes also indicate that Ms. Rex "went to hospital – too late to tell if drugs [were] involved."   (9/19/12 WVSOM Notes) (Document 100-13.)

their observations and interactions with Ms. Rex and D.M. during the night of the party and the morning after. None spoke with or directly interacted with Ms. Rex after she left the third apartment, the time period she cannot recall, though one witness reported seeing her making out with D.M. during that time.

WVSOM completed a final report of the investigation on December 10, 2012, and provided it to both parties. The report summarizes the statements by Ms. Rex and D.M., as well as the witnesses. WVSOM noted that witnesses at the party, as well as D.M.'s roommate, reported "contact of a sexual nature…which was consensual by both parties," and that D.M. claimed to offer to take her home and ask if she wanted to stop. (WVSOM Investigation Report at 11) (Document 100-17.) WVSOM did not otherwise indicate that it made any credibility determinations favoring either party, to the extent their accounts were inconsistent. Ultimately, WVSOM concluded that it was unclear whether any type of force, including coercion, was used during the first sexual contact "as the complainant is unable to provide any evidence," and that "there is not a preponderance of evidence that any type of force was used in the second sexual contact." (*Id.*) The report notes that D.M. "appeared to believe that he had her consent for the first encounter and since nothing had changed he also continued to have her consent in the second encounter." (*Id.*) WVSOM found that it was more likely than not that Ms. Rex was incapacitated during the first sexual encounter, and that "her ability to make decisions may be questionable, given that she may have still been under the influence of alcohol and believe herself to be in the midst of a sexual assault" as to the second. (*Id.* at 12.) However, it also concluded that "[t]here is not sufficient evidence to show that the respondent knew or should have reasonably known that she was incapacitated and therefore unable to give consent." (*Id.*)

Ultimately, WVSOM found Ms. Rex's sexual harassment claim "unfounded." "[G]iven the evidence presented, it was felt that a reasonable person would not have known that the complainant was incapacitated or that the sexual act[s] were not consensual." (*Id.* at 13.) It concluded:

> We believe by a preponderance of the evidence that the complainant was in a black out state and unable to provide consent. Further, we also determined, based on all the evidence presented by the complainant as well as witnesses, that a reasonable person would not have known that she was incapacitated and therefore unable to give consent. The preponderance of evidence indicates that the respondent did not reasonably know that the complainant was incapacitated.

(*Id.*) The report further indicated that the no-contact order would remain in place until Ms. Rex graduated. WVSOM did find that D.M. violated the Student Honor Code by engaging in "behaviors that negatively impacted fellow students" and "consumption of an illegal drug which he brought to the party." (*Id.* at 14.)

Ms. Rex appealed the investigation report. (Document 100-18.) She argued that it is not credible that D.M. did not know, or should not have known, that Ms. Rex was incapacitated, given that he did not have memory issues himself, and he had provided her with five to seven shots of Jägermeister. Ms. Rex noted D.M.'s testimony in Magistrate Court that he knew Ms. Rex was drinking too fast. Her appeal also notes some inconsistencies in D.M.'s statements to the police, in Magistrate Court, and to WVSOM. Ms. Rex also provided a hair follicle drug test showing GHB, a date rape drug, though only in quantities consistent with natural production in the body, and argued that the results, in combination with her symptoms and behavior, suggest she may have been drugged. She argued that the investigation was not adequate, reliable, or impartial, and was

10

untimely. She singled out the mutual no-contact order as an improper sanction on her as the complaining party, and WVSOM's failure to initiate a drug test after her initial report.

On January 24, 2013, WVSOM denied the appeal in a brief Memorandum of Decision, concluding that "petitioner's appeal fails to fall within the grounds for appeal listed in the appeals procedures." (Appeal Decision) (Document 100-32.) Without significant explanation, WVSOM found that Ms. Rex did not prove error on the grounds of (a) a procedural or substantive error that significantly impacted the outcome of the investigation; (b) new evidence unavailable during the original investigation; or (c) the sanctions are substantially disproportionate to the severity of the violation.

Ms. Rex later submitted another analysis of the same hair follicle collected on November 23, 2012, which found diazepam at an amount consistent with a single exposure during a time frame encompassing the night of the party. (X-Pertise Consulting lab report) (Document 100-20.) Dr. Schriefer contacted Ms. Rex's attorney on March 6, 2013, to request an explanation of the differences between the two lab results, one of which found GHB but was negative for diazepam, and the latter of which found diazepam. Ms. Rex's attorney explained that the latter lab used more sophisticated testing procedures,[6] and offered to make the hair sample available to WVSOM.

Ms. Rex requested a medical leave of absence on January 30, 2013, which WVSOM granted. In her deposition, she indicated that she took the medical leave while considering transferring so that she would have the option of returning to WVSOM if she was not accepted

---

6 Based on the lab reports, it appears that the later test analyzed individual sections of the hair sample. Thus, though both lab tests found GHB in similar quantities consistent with normal production, the latter concluded that Ms. Rex had not been given GHB because there was no spike. The later test also isolated a section of hair that was positive for diazepam, indicating that Ms. Rex ingested the drug on one occasion, but did not regularly use it.

elsewhere. She stated that Dr. Adelman wrote her letters of recommendation at her request to facilitate her transfer, and further recounted Dr. Adelman telling her that WVSOM could not keep her safe, and so the first priority was to get her "out of there." (N. Rex. Depo. at 155:4.) Ms. Rex has since transferred to another medical school.

## STANDARD OF REVIEW

The well-established standard for consideration of a motion for summary judgment is that summary judgment should be granted if the record, including the pleadings and other filings, discovery material, depositions, and affidavits, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013).

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the nonmoving party must satisfy its burden of showing a genuine factual dispute by offering more than "[m]ere

speculation" or a "scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. On the other hand, if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## DISCUSSION

WVSOM argues that it is entitled to summary judgment on all remaining counts. It asserts that it cannot be held liable under Title IX for the off-campus sexual assault, of which it had no notice, or for the subsequent comments and gossip on campus, because the comments are not sufficiently severe or pervasive to support a cause of action. It asserts that it responded reasonably to Ms. Rex's complaint by providing her with appropriate resources and accommodations and conducting a detailed and thorough investigation. WVSOM also argues that Ms. Rex has produced no evidence of retaliation under Title IX. WVSOM further argues that the invasion of privacy claim is barred by the statute of limitations, and is not supported by the facts in any case. WVSOM moves for summary judgment on the negligence claim, asserting that it is based on failure to comply with Title IX, and there is no implied right of action under Title IX for violations of administrative requirements. WVSOM argues that there is no evidence that it engaged in the unauthorized practice of law. Finally, WVSOM seeks summary judgment on Ms. Rex's

intentional infliction of emotional distress, as the facts do not support a finding that WVSM's conduct is atrocious, intolerable, or outside the bounds of decency.

A. *Motion for Entry of Judgment and Plaintiff's Response*

As noted above, the Plaintiff did not respond to the motion for summary judgment. Well after the deadline for a response, WVSOM filed a motion for entry of summary judgment based on the Plaintiff's failure to dispute its factual assertions. The Plaintiff responded to WVSOM's motion for entry of judgment by asserting that some discovery remained outstanding, and that WVSOM had made last-minute disclosures that prevented a timely response. WVSOM disputes the Plaintiff's characterization of the discovery issues.

WVSOM's motion for summary judgment was filed on January 25, 2017, the deadline for such motions pursuant to an *Order* (Document 95) granting a joint motion to extend the dispositive motions deadline as well as certain discovery deadlines. Noting that some discovery deadlines proposed by the parties fell after the dispositive motions deadline, the Court "accepted the parties' proposed deadlines in order to permit flexibility in scheduling depositions. However, incomplete discovery will **not** constitute good cause for further extension of the dispositive motions deadline." (Document 95, at fn 1) (emphasis in original.) Local Rule of Civil Procedure 7.1(a)(7) provides that responses to motions are due within fourteen (14) days, and replies are due within seven (7) days. Rule 56(d) of the Federal Rules of Civil Procedure provides that the non-movant may show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Upon the filing of such an affidavit, the court may defer consideration of the motion, deny it, permit the necessary discovery, or issue another appropriate order.

The Plaintiff did not file an affidavit or declaration describing the asserted unavailable discovery necessary to her response. She did not file a motion for an extension of time to respond. Instead, the Plaintiff simply ignored the timely filed motion for summary judgment for nearly six weeks, at which time she filed a document asserting a litany of discovery related complaints, notwithstanding the expiration of all relevant discovery deadlines.[7] Accordingly, the Court finds it appropriate to consider the motion for summary judgment without any response by the Plaintiff.

However, the Court does not find that the Plaintiff's failure to respond requires entry of summary judgment absent thorough review and consideration of WVSOM's motion and supporting evidence. Federal Rule of Civil Procedure 56(e) provides that, if a party fails to address a factual assertion, the court may "grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it." WVSOM, as the moving party, bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Even absent a response from the Plaintiff, the Court must determine whether WVSOM has met that burden as to each claim.

---

[7] The Plaintiff's response to the motion for entry of summary judgment did request that the Court "schedule this matter for a conference to address all outstanding issues related to discovery and deadlines," (Resp. at 10), and the Magistrate Judge held an informal discovery conference at the parties' request on March 28, 2017. (Documents 121 & 122.) However, since the parties' January 9, 2017 joint motion to continue certain deadlines, referenced above, there has been no motion to compel, motion to continue, or other motion seeking relief for the asserted discovery difficulties. In short, the Plaintiff requests that the Court deny the motion for summary judgment without review because of discovery disputes that were not timely brought to the Court's attention, leaving the Defendant with no opportunity to file dispositive motions. Though the Court is cognizant of the strong preference for resolution on the merits, which would be furthered by consideration of a response to the motion for summary judgment, excusing the Plaintiff's attorneys' neglect and unjustified delay in this case would unfairly prejudice the Defendant and render applicable rules meaningless.

*B. Title IX – Deliberate Indifference*

Title IX provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. A school receiving federal funds may be held liable for student-on-student harassment "where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633, (1999). Deliberate indifference is applicable only where the institution has authority to take remedial action. *Id.* at 644. The Supreme Court emphasized that schools retain flexibility in properly handling disciplinary matters and may be found deliberately indifferent only where the "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. *Id.* at 648. "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law." *Id.* at 649.

"To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution." *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007).

Ms. Rex was undisputedly a student at WVSOM, which received federal funds. Sexual assault is considered "harassment based on sex." Sexual assault could be sufficiently severe to

create a hostile or abusive environment, absent an appropriate response by the institution. The primary question raised by WVSOM's motion for summary judgment is whether there is a basis for imputing liability—which centers on whether a jury could find that WVSOM's response, including its investigation, was clearly unreasonable. WVSOM, of course, cannot be liable for the occurrence of an off-campus sexual assault, but is obligated to investigate and respond to a complaint of an assault on a student by a fellow student.

Courts in the past have approved certain steps taken by WVSOM, such as separating the impacted students and providing an escort[8] for the victim of harassment. *See, e.g.*, *Doe v. Bd. of Educ. of Prince George's Cty.*, 605 F. App'x 159, 166 (4th Cir. 2015) (unpublished). Dr. Schriefer, at the direction of WVSOM, accompanied Ms. Rex to make a police report promptly after she reported the alleged assault. She then went to the hospital, accompanied by friends who were also WVSOM students. WVSOM assisted her in obtaining counselling services, and guided her through the complaint and investigation process.

WVSOM conducted an investigation by taking statements from Ms. Rex, D.M., and potential witnesses. It stayed in contact with the detective who took statements for the criminal investigation and reviewed his report. WVSOM prepared a report setting forth its findings, which was provided to both Ms. Rex and D.M. The report concluded that Ms. Rex was incapacitated for the first sexual encounter, but that there was no evidence that D.M. should reasonably have known that she was unable to consent. It cited D.M.'s statements, as well as witnesses who observed Ms. Rex dancing and interacting with D.M. at the party, including during a portion of the time period she cannot recall. The report further concluded that Ms. Rex did not express her

---

8 The record reflects some dispute regarding whether Ms. Rex rejected the escort or whether the escort was often unavailable.

lack of consent to the second sexual encounter, and D.M. reasonably believed it to be consensual. The report found that the sexual assault claim against D.M. was unfounded, but nonetheless suggested that the no-contact order remain in place for as long as both D.M. and Ms. Rex were both students. Though Ms. Rex provided WVSOM with statements and evidence that could have supported a different conclusion, WVSOM apparently credited D.M.'s statements, as partially corroborated by other witnesses. This Court cannot properly review the credibility determinations made by the institution performing a Title IX investigation.

Ms. Rex also complained of harassment on campus following her complaint. WVSOM focuses on three incidents: a Facebook status from a friend of D.M., a professor who complained about Title IX training, and a staff member who discussed Ms. Rex with students. Notes of interviews suggest that Ms. Rex complained of prevalent gossip, with students she did not know asking her about her rape and treating it is a humorous subject. The staff member's role in contributing to the gossip is also unclear; she admits to having conversations about it and to students approaching her to ask about it because of her relationship with D.M. It is unclear what, if anything, WVSOM could have done regarding gossip among students. Each time Ms. Rex approached WVSOM with a specific complaint, it addressed her concerns by speaking with the staff members and/or students whose conduct or statements were at issue.

Ms. Rex indicates that President Adelman told her WVSOM could not keep her safe and assisted her in transferring. The context of the statement about Ms. Rex's safety is unclear. In light of WVSOM's responses to Ms. Rex's sexual assault complaint and subsequent informal complaint about harassment on campus, the Court finds that WVSOM has met its burden of showing that there is no genuine issue of material fact with respect to alleged deliberate

indifference.   Ms. Rex has produced no contrary evidence that would permit a jury to conclude that WVSOM's response to her complaint was clearly unreasonable.   WVSOM's motion for summary judgment as to Counts One and Two should therefore be granted.

### C.  Title IX – Retaliation

The Supreme Court has found that retaliation against a person who has filed a complaint of sexual discrimination or harassment is "another form of intentional sex discrimination encompassed by Title IX's private cause of action."   *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005).   "A prima facie retaliation claim must show (1) engagement in a protected activity; (2) an adverse action; and (3) a causal connection between the protected activity and the adverse action."   *Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481, 489 (D. Md. 2015) (concluding that the standards set forth in *Coleman v. Md. Court of Appeals,* 626 F.3d 187, 190 (4th Cir.2010) for retaliation in the Title VII context are applicable to Title IX.)

WVSOM took some actions to support Ms. Rex after her complaint, including assisting her in obtaining counselling.   It also imposed a no-contact order and led her to believe that she could not discuss her alleged sexual assault or pending complaint with friends on campus.[9]   An investigation of her aunt, a WVSOM employee, further dismantled her support system.   Ms. Rex recognized that WVSOM provided legitimate reasons for the investigation into her aunt, but she noted that the timing seemed to coincide suspiciously with her efforts to push the investigation, particularly when she mentioned D.M.'s friend C.W., whose father apparently brought the complaint against Ms. Rex's aunt.   However, nothing in the record beyond Ms. Rex's speculation

---

9 The record is not fully developed with respect to the asserted instruction that Ms. Rex not discuss her case. However, she indicates that she was told not to talk to Dr. Schriefer or other students, though she ignored the instruction not to talk to Dr. Schriefer.

at her deposition supports a conclusion that the investigation into her aunt was retaliatory. Indeed, C.W. does not appear to have been involved in the sexual harassment investigation, and the sexual harassment investigation continued. The record before the Court contains no evidence that Ms. Rex was discouraged by any WVSOM official from pursuing her complaint. The Court finds that WVSOM has met its burden of producing evidence—and pointing to a lack of evidence in the record—to demonstrate that there is no genuine issue of material fact with respect to Count Thirteen.

### D. Invasion of Privacy

In West Virginia, "[a]n invasion of privacy includes (1) an unreasonable intrusion upon the seclusion of another; (2) an appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public." Syl. Pt. 8, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 74 (W.Va. 1983). Invasion of privacy claims are subject to a one-year statute of limitations. Syl. Pt. 1, *Slack v. Kanawha Cty. Hous. & Redevelopment Auth.*, 423 S.E.2d 547, 548 (W. Va. 1992). Ms. Rex's claim is for unreasonable publicity given to another's private life. All events relevant to the alleged invasion of privacy appear to have occurred in 2012 and 2013. The complaint was filed on January 23, 2015. Ms. Rex has presented no evidence of any conduct occurring within the statute of limitations or of any equitable cause for extending the statute of limitations. Therefore, the Court finds that WVSOM has established that it is entitled to summary judgment as to Count Eight.

*E. Negligence*

The basic elements of a negligence claim are duty, breach of that duty, causation, and damages. "In order to establish a negligence claim in West Virginia, '[a] plaintiff must prove by a preponderance of the evidence that the defendant owed a legal duty to the plaintiff and that by breaching that duty the defendant proximately caused the injuries of the plaintiff.'" *Cline v. 7-Eleven, Inc.*, 2012 WL 5471761 (N.D.W. Va. Nov. 9, 2012) (citing *Neely v. Belk, Inc.,* 668 S.E.2d 189, 197 (W.Va.2008)).

Ms. Rex's negligence claim is based on WVSOM's duties pursuant to Title IX. WVSOM argues that the Supreme Court's holding in *Gebser* bars negligence claims based on Title IX. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998) ("We have never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements," emphasizing the necessity of showing deliberate indifference). As the Court has found that Ms. Rex failed to produce evidence that would permit a jury to find in her favor as to a Title IX claim for deliberate indifference, the Court finds that WVSOM is also entitled to summary judgment as to the negligence claim based on Title IX duties.

*F. Unauthorized Practice of Law*

In West Virginia, "[a] party who has suffered…a legally cognizable injury…as a proximate result of the unlawful and unauthorized practice of law by another has standing to assert a claim…seeking relief." Syl. Pt. 1, *McMahon v. Advanced Title Servs. Co. of W. Virginia*, 607 S.E.2d 519, 520 (W. Va. 2004). Ms. Rex's claim for unauthorized practice of law relates to President Adelman's advice that she did not need counsel at the initial personal safety hearing before the magistrate. WVSOM has presented evidence that President Adelman did not hold

himself out as an attorney. Ms. Rex stated that she did not recall where she had heard that he was an attorney. Ms. Rex has not come forward with evidence that would support her claim for unauthorized practice of law, and so the Court finds that WVSOM is entitled to summary judgment as to Count Eleven.

### G. Intentional Infliction of Emotional Distress

The West Virginia Supreme Court has established the following elements for IIED claims:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. pt. 3, *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 421 (W. Va. 1998) (reaffirmed in *Hatfield v. Health Mgmt. Associates of W. Virginia*, 672 S.E.2d 395, 404 (W. Va. 2008). The evidence in the record does not support an IIED claim. Viewing the evidence in the light most favorable to Ms. Rex, a jury could find that WVSOM engaged in a half-hearted and biased investigation and encouraged her to transfer rather than adequately address her sexual assault and subsequent harassment. While serious, that conduct is not "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency." As the Plaintiff has not come forward with evidence establishing a triable factual dispute on this issue, the Court finds that WVSOM is entitled to summary judgment as to Count Twelve.

## CONCLUSION

WHEREFORE, after thorough review and careful consideration, the Court **ORDERS** that the *Motion for Entry of Summary Judgment on Behalf of Defendant West Virginia School of*

*Osteopathic Medicine* (Document 112) be **DENIED** and that the *Defendant's Motion for Summary*

*Judgment* (Document 100) be **GRANTED.** The Court further **ORDERS** that all pending motions

be **TERMINATED AS MOOT.**

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record

and to any unrepresented party.

ENTER: April 12, 2017

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA